UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RACHEL LIU,

*Plaintiff,*

v.

88 LEXINGTON AVENUE
CONDOMINIUM; 90 LEXINGTON
AVENUE CONDOMINIUM; GUMLEY-
HAFT LLC; and LIV UNLTD, LLC,

*Defendants.*

Civ. No. 25-3553

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Rachel Liu, by and through her undersigned counsel, hereby states her Complaint

against Defendants 88 Lexington Avenue Condominium and 90 Lexington Avenue Condominium

(together, the "Condominiums") along with Defendants Gumley-Haft, LLC and LIV unLtd, LLC

based upon personal knowledge and information and belief:

## INTRODUCTION

1.      Rachel Liu pays a hefty price tag to live at 88 & 90 Lex, a condominium self-

described as "an address that defies expectations"[1]—very true but for all the wrong reasons.

Although Defendants profess to "fully support the principles of the Fair Housing Act,"[2] Ms. Liu

was excluded from amenities and subject to illegal demands and retaliatory actions simply because

of the presence of her service dog, which she uses to manage her disabilities under city, state, and

federal law.

---

[1] https://88and90lex.com/.
[2] *Id.*

2.      City, state, and federal law prohibit Defendants from discriminating against any individual on the basis of disability in the full and equal enjoyment of their goods, services, facilities, privileges, advantages or accommodations.

3.      Those laws specifically require Defendants to make reasonable modifications in policies, practices, and procedures, to permit the use of service animals by persons with disabilities at condominiums and their amenities.

4.      The Condominiums boast an impressive array of amenities: "Residents at 88 & 90 Lex have exclusive access to 10,000 square feet of private amenities catering to health, wellness, and leisure. Work out on the latest fitness equipment and unwind in the sauna and steam rooms. Grill with neighbors on the rooftop terrace, read the newspaper in the residents' lounge, or kick back with a movie in the private screening room. Kids have a place to call their own, with an imaginative playroom made for jumping, sliding, and exploring with friends."[3]

5.      Residents at 88 & 90 Lex may use an atrium swimming pool, a game room or residents' lounge, a screening room, a children's playroom, a fitness center, a lobby, and a lobby lounge.[4]

6.      However, from February 14 until March 14 or later, the Condominiums, along with LIVunLtd and Gumley Haft, excluded Ms. Liu from amenities that she pays for simply because of the presence of her service dog.

7.      As of April 2, 2025, Defendants finally agreed that Ms. Liu has a service dog and no longer required further documentation, but the Amenity Center Facilities General Rules still pose issues.

---

[3] https://88and90lex.com/amenities/.
[4] *Id.*

8.    Under the Amenity Center Facilities General Rules, the "Condominiums reserve the right to request documentation certifying the following: 1. The animal is required because of a disability. 2. The work or task the animal has been trained to perform." There is no right to demand such documentation, posing a risk to Ms. Liu.

9.    Furthermore, the Amenity Center Facilities General Rules require all service animals to wear a "service animal identification harness/vest" and to be "leashed at all times." Yet there is no requirement under the law that a service animal wear an identification harness/vest or be leashed at all times. *See, e.g.*, 28 C.F.R. § 36.302(c)(4) (ADA regulation making clear that the governing inquiry is about control—not a leash).

10.    What is distressing is that Ms. Liu's failure to abide by these illegal terms may subject her "to a fine AND los[ing her] privilege to use the Amenity Center Facilities."

11.    Ms. Liu's condo is her sanctuary—a port of call from a weary world—where she wishes to live freely and independently. To the contrary, Ms. Liu was long burdened with disability discrimination, causing emotional distress, out-of-pocket losses, civil rights violations, and more.

12.    Ms. Liu is entitled to manage her disabilities through a service dog—without restrictions and impermissible demands for documentation.

13.    Accordingly, Ms. Liu seeks declaratory, injunctive, and compensatory relief, as well as reasonable attorney's fees and costs, under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et. seq.*; the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*; and the New York City Human Rights Law ("NYCHRL"), § 8-101 *et seq.*

## PARTIES

14.    Plaintiff Rachel Liu was at all times relevant a resident of New York City and a resident of the Condominiums.

15.     Upon information and belief, Defendant 88 Lexington Avenue Condominium (together with Defendant 90 Lexington Avenue Condominium, the "Condominiums") is a for-profit condominium complex located at 88 Lexington Avenue, New York, NY 10016.

16.     Upon information and belief, Defendant 90 Lexington Avenue Condominium is a for-profit condominium complex located at 90 Lexington Avenue, New York, NY 10016.

17.     Upon information and belief, Defendant Gumley-Haft LLC ("Gumley Haft") is a for-profit corporation that manages the Condominiums and has a principal address at 1501 Broadway, Suite 1001, New York, NY 10036.

18.     Upon information and belief, Defendant LIV unLtd, LLC ("LIVunLtd") is a for-profit corporation that was hired by Gumley Haft to manage the amenities at the Condominiums, including the gym, pool, and lounge, and that has a principal address at 9 E. 40th St. 7th Floor, New York, NY 10016.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction over the subject matter of the action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claim arising under the laws of the United States and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under state, local, and/or common law.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants operate their business in this district and have sufficient contacts to be subject to personal jurisdiction in this District and because a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

21.     Rachel Liu, a disabled individual who uses a service dog to mitigate her disabilities, has at all relevant times been a resident of the Condominiums and, as such, is entitled to use the Condominiums' amenities like any other resident.

22.     Ms. Liu was diagnosed with social phobia disorder, depression, anxiety, Ehlers-Danlos Syndrome, and Postural Orthostatic Tachycardia Syndrome ("POTS"), among other things. Her disabilities affect the major life activities of caring for herself, performing manual tasks, and more. Her service dog helps her perform tasks to ameliorate her disabilities.

23.     Ms. Liu's service dog is trained to assist her with a culmination of all her conditions in a variety of ways, including: (1) alerting her when her heart rate indicates the need to sit down; (2) alerting her to impending disorientation; (3) guiding her to a safe area when necessary; (4) retrieving her medication; and (5) providing deep pressure stimulation or tactile stimulation during episodes.

24.     Ms. Liu provided Defendants with a letter from her psychiatrist, Dr. Ruth A. Richter, stating that Ms. Liu "meet[s] the definition of disability under the ADA, Americans with Disabilities Act."

25.     On or about April 2, 2025, Defendants acknowledged that Ms. Liu has a service dog, and service dogs ameliorate disabilities.

26.     Ms. Liu resides at the Condominiums with a monthly Common Charge of $2,572.09.

27.     Defendants have known that Ms. Liu has a trained service animal since 2019.

28.     At all relevant times, Ms. Liu's service dog has been under her control.

29.     In 2019, Ms. Liu was denied access to her building's amenities and asked to leave by the Condominiums' Resident Manager, Ben Cosovic, and another manager of LIVunLtd, because the Condominiums' Amenity Space Rules specified that only hearing dogs and guide dogs were allowed, not service dogs like Ms. Liu's.

30.     On May 19, 2019, Leticia Taylor, former Resident Experience Manager of LIVunLtd, apologized to Ms. Liu and acknowledged her service animal after initially insisting that Ms. Liu remove her service dog from the amenities space. Both Ben Cosovic of the Condominiums and a former property manager were involved in these discussions.

31.     In addition, over the years, Ms. Liu has told several LIVunLTD employees downstairs that she has a trained service dog.

32.     Then on February 10, 2025, Ms. Liu was again asked to leave the gym because of her service dog.

33.     LIVunLtd's "resident experience manager," Laura Hern, approached Ms. Liu and, after confirming with Ms. Liu that her dog was a service dog, required them to leave anyway. Ms. Hern claimed that Ms. Liu's service dog was required to be "registered" with the Condominiums as well, and that she had confirmed this with Ben Cosovic.

34.     Ms. Liu then went to speak with Mr. Cosovic, who claimed that Ms. Liu would have to submit her service dog paperwork and documentation to the Condominiums' board for approval. Mr. Cosovic also raised vague concerns that other people might have allergies.

35.     Ms. Liu informed two Gumley Haft employees about this issue: account executive Alex Perez and an account supervisor named Christina.

36.     On February 11, 2025, Mr. Perez emailed Ms. Liu, stating: "As a follow up to our conversation yesterday, we are taking the matter very seriously and have engaged the

condominium's counsel. From our understanding, an individual with a disability who requests a reasonable accommodation may be asked to provide documentation so that the homeowner's association can properly review the accommodation request. We are allowed to  ask a person to certify, in writing, (1) that the tenant or a member of his or her family is a person with a disability; (2) the need for the animal to assist the person with that specific disability; and (3) that the animal actually assists the person with a disability."

37.    Ms. Liu informed Mr. Perez that these were the rules for emotional support animals, not service animals; and that the Condominiums' inquiry under governing law should be limited to asking about (1) whether the service animal is required because of a disability, and (2) what work or task has the animal been trained to perform.

38.    Indeed, the Condominiums' amenities rules as of February 11, 2025 stated as follows:

- Pets or other animals, expect for service animals as defined by Title II and Title III of the ADA, are prohibited in the Amenity Center Facilities. Service animals must be accompanied by their handler, wearing the service animal identification harness/vest, and leashed at all times. If a service animal behaves in an unacceptable way, and the handler does not control the animal, the Buildings can revoke the service animal's access to the Amenity Center Facilities. Uncontrolled barking, jumping on other people, jumping onto or otherwise being on furniture, and running away from handler are a few examples of unacceptable behavior for a service animal.

- The Condominiums reserve the right to request documentation certifying the following: 1. The animal is required because of a disability. 2. The work or task the animal has been trained to perform.

39.    That same day, Ms. Liu proactively sent the Condominiums' board (the "Board") and Gumley Haft a letter from her psychiatrist, Dr. Ruth A. Richter, stating that Ms. Liu has a disability and a trained service dog that performs tasks to help mitigate her disability: "Rachel Liu

has been a patient under my care since April 30, 2018. Ms. Liu's diagnosis and treatment meet the definition of disability under the ADA, Americans with Disabilities Act. Ms. Liu has a trained service dog who performs tasks and assists her with managing her symptoms and mitigating her disability."

40.     A day after the psychiatrist's letter, Alex Perez of Gumley Haft emailed Ms. Liu and referenced "[her] service animal."

41.     On February 13, 2025, Jason Des Verney, vice president of LIVunLtd, recorded Ms. Liu in the gym without her consent, leading to the police being called and a report made by Ms. Liu against Mr. Des Verney for harassment.

42.     After Ms. Liu advocated for her basic rights, she was also subject to impermissible demands for documentation and complaints of supposedly abusive behavior.

43.     In addition, Ms. Liu has inquired about purchasing an additional storage space in the Condominiums but has received radio silence from Ben Cosovic, who has been involved with the underlying incidents.

44.     On February 18, 2025, Ms. Liu requested clarification from Gumley Haft on whether she would be allowed to continue using the amenities with her service dog, but she did not receive a response.

45.     Subsequently, property management sent out another email with the same amenity rules regarding service dogs but included more information on how violators of these rules would face penalties, such as fines.

46.     As of April 2, 2025, Defendants agreed that there would be no further objections to Ms. Liu's service dog accompanying her to any of the amenities, including the gym. Thus, for a great while, it was not clear whether Ms. Liu could access the amenities with her service dog.

47.     By virtue of that agreement, Defendants concede that Ms. Liu has had a service dog, nor was any further documentation required to verify the fact that Ms. Liu had a service dog.

48.     To avoid any doubt, on April 8, 2025, Ms. Liu emailed various individuals, in which she states: "My understanding is that there will be no further objections to my service dog accompanying me to any of the 88/90 Lex amenities, including the gym. If I'm mistaken, please write back and let me know."

49.     Gumley Haft's Alex Perez wrote back to Ms. Liu: "Confirming that is correct; you are not mistaken."

50.     The Condominiums' Ben Cosovic also wrote back to Ms. Liu: "Yes I received instructions from management.  I will advise my staff of this."

51.     Furthermore, LIVunLtd's Jason Des Verney wrote back to Ms. Liu: "We are aware of the building's accommodation approval and we have no objections."

52.     To date, however, the Amenity Center Facilities General Rules still require documentation for service animals as well as leashes and vests/harnesses, none of which are permitted.

53.     As of April 29, 2025, the Amenity Center Facilities General Rules make no mention of assistance animals under the FHA.

### CLAIM I:     Violations of the Fair Housing Act

54.     Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

55.     This action is brought to enforce the requirements of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, *et. seq.*

56.     At all relevant times, Plaintiff has had a handicap as that term is defined in 42

U.S.C. § 3602(h).

57.     Plaintiff is an aggrieved person as defined by 42 U.S.C. § 3602(i) and 3613(a)(1)(A).

58.     Defendants own and/or lease and/or provide services at dwellings within the meaning of U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

59.     Plaintiff lives in a dwelling owned and/or leased by Defendants.

60.     The FHA applies to all dwellings "except as exempted by sections 803(b) [§ 3603(b)] and 807 [§ 3607] of this title." 42 U.S.C. § 3604; *see also* 42 U.S.C. § 3603(a) (stating that upon enactment, the FHA's prohibition of discrimination in the sale or rental of dwellings would immediately cover four types of dwellings, and after December 31, 1968, such coverage would extend to "all other dwellings except as exempted by [Section 3603(b)]").

61.     The FHA provides that it is illegal "to discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

62.     Under the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, polices, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

63.     Federal regulations make clear that the "equal opportunity to use and enjoy a dwelling" includes "public and common use areas," 24 C.F.R. § 100.204(a) (implementing regulation of the FHA), and "[c]ommon use areas means rooms, spaces or elements inside or outside of a building that are made available for the use of residents of a building or the guests

thereof. These areas include . . . lounges," among other areas. *Id.* § 100.201. Gyms also fit that description.

64.    Instead of "service animals," the FHA permits "assistance animals"—a broader term that includes an animal that "performs tasks for the benefit of a person with a disability, or that provides emotional support that alleviates one or more identified effects of a person's disability." U.S. Dep't of Housing & Urban Dev., Assistance Animals (viewed March 17, 2025); *see also* U.S. Dep't of Housing & Urban Dev, Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act, *available at* https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf.

65.    "For purposes of a service animal," the U.S. Department of Housing and Urban Development "interprets the Fair Housing Act to require access for individuals who use service animals and housing providers should follow the analysis that the Department of Justice has determined is used for assessing whether an animal is a service animal under the ADA." U.S. Dep't of Housing & Urban Dev., Frequently Asked Questions (FAQs), Do I have to request a reasonable accommodation in order to have an assistance animal? (last viewed March 17, 2025); *see also* U.S. Dep't of Housing & Urban Dev, Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act, *available at* https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf.

66.    "Because HUD interprets the FHA to require access for individuals who use service animals, housing providers should initially follow the analysis that DOJ has determined is used for assessing whether an animal is a service animal under the ADA." U.S. Dep't of Housing & Urban Dev., Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act (last viewed March 17, 2025); *see also* U.S. Dep't of Housing & Urban Dev,

Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act, *available at* https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf.

67.    "If the animal is a service animal under the ADA . . . a housing provider cannot require an individual with a disability to produce medical documentation." U.S. Dep't of Housing & Urban Dev., Frequently Asked Questions (FAQs), Does an assistance animal have to have special training or a certificate? (last viewed March 17, 2025); *see also* U.S. Dep't of Housing & Urban Dev, Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act, *available at* https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf.

68.    Indeed, "[c]overed entities may not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal, as a condition for entry." *See* U.S. Dep't of Justice, "Frequently Asked Questions about Service Animals and the ADA" (2015), *available at* https://archive.ada.gov/regs2010/service_animal_qa.pdf.[5]

69.    What is more, "[a]llergies . . . are not valid reasons for denying access or refusing service to people using service animals." U.S. Department of Justice, ADA Requirements: Service Animals, *available at* https://www.ada.gov/resources/service-animals-2010-requirements/.

70.    "Under the Fair Housing Act . . . a housing provider may request verification when an individual asks to have an assistance animal as a reasonable accommodation only if their disability . . . is not known or obvious." U.S. Dep't of Housing & Urban Dev., Frequently Asked Questions (FAQs), Can a housing provider seek verification if you request a reasonable

---

[5] The U.S. Department of Justice is "the agency directed by Congress to issue implementing regulations" and "to render technical assistance explaining the responsibilities of covered individuals and institutions." *See Bragdon v. Abbott*, 524 U.S. 624, 646 (1998).

accommodation for an assistance animal? (last viewed March 17, 2025); *see also* U.S. Dep't of Housing & Urban Dev, Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act, *available at* https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf.

71.     "Verification should never . . . require an individual to disclose a diagnosis." U.S. Dep't of Housing & Urban Dev., Frequently Asked Questions (FAQs), What is "verification"? (last viewed March 17, 2025); *see also* U.S. Dep't of Housing & Urban Dev, Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act, *available at* https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf.

72.     The FHA also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section ... 3604[.]" 42 U.S.C. § 3617.

73.     Defendants have discriminated against Plaintiff on the basis of her disability in violation of the above-cited provisions of the FHA by excluding her from amenities simply because of the presence of her service dog, imposing requirements that exceed governing law, and retaliating against her.

74.     Defendants retaliated against Plaintiff after she engaged in the protected activities of complaining about unlawful disability discrimination and requesting reasonable accommodations.

75.     Defendants' actions and omissions were intentional, willful, and in disregard of Plaintiff's rights under the FHA, and demonstrate a discriminatory motive.

76.     As a direct and proximate result of Defendants' discriminatory and retaliatory

conduct, Plaintiff suffered emotional pain and trauma along with out-of-pocket losses.

77.    Plaintiff is therefore entitled to nominal damages as a result of Defendants' discriminatory conduct pursuant to 42 U.S.C. § 3604, *et. seq.*, and is further entitled to entitled to compensatory damages, punitive damages, and reasonable attorney's fees and costs pursuant to the FHA. 42 U.S.C. § 3613(c).

### CLAIM II:    Violations of the New York State Human Rights Law

78.    Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above as if set forth more fully and at length herein.

79.    At all times relevant to this action, New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, *et seq.*, has been in full force and effect and has applied to Defendants' conduct.

80.    At all relevant times, Plaintiff has had a disability as defined by New York State Executive Law § 292(21).

81.    The unit Plaintiff resides in is a housing accommodation as defined by New York State Executive Law § 292(10).

82.    The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of . . . disability . . . directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . or that the patronage or custom threat of any person of or purporting to . . . having a disability is unwelcome, objectionable or not acceptable, desired or solicited." N.Y. Exec. Law § 296(2)(a).

83.    The NYSHRL defines "discriminatory practice" as including "a refusal to make

14

reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations." N.Y. Exec. Law § 296(2)(c)(i).

84. The NYSHRL further defines discriminatory practice as "a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden." N.Y. Exec. Law § 296(2)(c)(ii).

85. Additionally, it "shall be an unlawful discriminatory practice in any activity covered by this section to deny access or otherwise to discriminate against . . . a person with [a] disability because he or she is accompanied by a dog that has been trained to work or perform specific tasks for the benefit of such person." N.Y. Exec. Law § 296(14).

86. Defendants discriminated against Plaintiff on the basis of disability, in violation of the NYSHRL, as set forth above.

87. Defendants collectively failed to provide reasonable modifications to their policies, practices, or procedures to accommodate Plaintiff's disability and unlawfully denied Plaintiff access to the Condominiums' amenities in violation of N.Y. Exec. Law § 296(2).

88. Under New York Law, it is also unlawful to "retaliate or discriminate against any person because he or she has opposed practices[,]" including a refusal to "sell, rent, lease or otherwise deny or withhold from any person ... such a housing accommodation because of the

race, creed, color, national origin, sexual orientation, military status, sex, age, disability, marital status, or familial status of such person[.]" N.Y. Exec. Law §§ 296(5), (7)

89.     The same standards that govern retaliation under the FHA apply to retaliation claims under the NYHRL. *See Broome v. Biondi*, 17 F.Supp.2d 211, 218–219 (S.D.N.Y.1997) (listing elements of a prima facie case of retaliation under the FHA and NYHRL).

90.     Defendants retaliated against Plaintiff after she engaged in the protected activities of complaining about unlawful disability discrimination and requesting reasonable accommodations, in violation of the NYSHRL, as set forth above.

91.     Defendants' actions and omissions were intentional, willful, and in disregard of Plaintiff's rights under the NYSHRL, and demonstrate a discriminatory motive.

92.     Plaintiff is therefore entitled to monetary damages, including compensatory damages, and injunctive relief pursuant to the NYSHRL. N.Y. Exec. Law. § 297(9).

93.     As a direct and proximate result of Defendants' discriminatory and retaliatory conduct, Plaintiff suffered emotional pain and trauma along with out-of-pocket losses.

### CLAIM III:   Violations of the New York City Human Rights Law

94.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above as if set forth more fully and at length herein.

95.     The New York City Human Rights Law ("NYCHRL"), Title 8 of the New York City Administrative Code, § 8-101 *et seq.,* prohibits discrimination based on discrimination in places of public accommodation and housing accommodations.

96.     At all relevant times, Plaintiff has had a disability as defined by New York City Human Rights Law, N.Y.C. Administrative Code § 8-102.

97.     Plaintiff is a person as defined by N.Y.C. Admin. Code § 8-102(1).

98.     Defendants' Condominiums are a housing accommodation within the meaning of N.Y.C. Admin. Code § 8-102(10).

99.     The New York Court of Appeals has recognized that "the NYCHRL was intended to be more protective than the state and federal counterparts . . . with the aim of making it the most progressive in the nation." *Makinen v. City of N.Y.*, 30 N.Y.3d 81, 88 (N.Y. 2017) (cleaned up). In *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62 (1st Dep't 2009), for example, the Appellate Division "adopt[ed] a new . . . standard for determining liability" in favor of a new standard "that 'is most faithful to the uniquely broad and remedial purposes of [the statute]'"—even "without any input from the parties concerned." *Id.* at 83 (Andrias, J., concurring); *see also id.* at 78. The majority opinion in *Williams* was one of three opinions ratified by the Restoration Act as having "correctly understood and analyzed the liberal construction requirement of . . . [8-130] and that have developed legal doctrines accordingly that reflect the broad and remedial purposes of [the NYCHRL]." N.Y.C. Admin. Code § 8-130(c).

100.    Pursuant to N.Y.C. Admin. Code § 8-107(4), it shall be unlawful discrimination for "any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of . . . disability . . . of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

101.    Additionally, pursuant to N.Y.C. Admin. Code § 8-107(15)(a), a place of public accommodation "shall make reasonable accommodation to enable a person with a disability to enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity."

102.    The NYCHRL defines "reasonable accommodations" as any "accommodation that can be made that does not cause undue hardship in the conduct of the covered entity's business," and "[t]he covered entity has the burden of proving undue hardship." *Id.* § 8-102.

103.    Despite being aware of Ms. Liu's accessibility needs and their obligations under the law, Defendants have failed to modify or adjust their policies to permit Ms. Liu's service dog in its amenities facilities, thus failing to make reasonable accommodations for persons with disabilities.

104.    Defendants discriminated on the basis of disability by withholding the accommodations, advantages, facilities or privileges of Defendants' services in violation of N.Y.C. Admin. Code § 8-107(4); by failing to accommodate in violation of N.Y.C. Admin. Code § 8-107(15)(a); and by adopting policies that discriminate and deny full and equal participation in housing because of disability in violation of N.Y.C. Admin. Code § 8-107(5)(a).

105.    In addition, the NYCHRL makes it "an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter . . . , [or] (v) requested a reasonable accommodation under this chapter. . . . The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8-107(7)

106.    Defendants retaliated against Plaintiff after she engaged in the protected activities of complaining about unlawful disability discrimination and requesting reasonable accommodations, in violation of the NYCHRL, as set forth above.

107.    The NYCHRL extends standing and relief to "any person claiming to be aggrieved by an unlawful discriminatory practice" in violation thereof. N.Y.C. Admin. Code § 8-502(a). Plaintiff is an aggrieved person as defined by Section 8-502(a) of the N.Y.C. Admin. Code.

108.    Ms. Liu is entitled to compensatory damages under the NYCHRL even if her "only injury is the deprivation of a right granted or protected by [the statute]," N.Y.C. Admin. Code § 8-502(h)(2), because she is "claiming to be a person aggrieved by an unlawful discriminatory practice as defined [by the statute]." *Id.* § 8-502(a).

109.    As a direct and proximate result of Defendants' discriminatory and retaliatory conduct, Plaintiff suffered emotional pain and trauma along with out-of-pocket losses.

110.    Plaintiff is therefore entitled to seek and recover compensatory and punitive damages for the injuries and loss she sustained as a result of Defendants' discriminatory conduct, as hereinbefore alleged pursuant to N.Y.C. Admin. Code § 8-502(a).

111.    Plaintiff is further entitled to an award of attorney's fees, costs, and disbursements pursuant to N.Y.C. Admin. Code § 8-502(g).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Rachel Liu hereby demands a trial on the merits by jury pursuant to Fed. R. Civ. P. 38. Plaintiff respectfully requests that this Court:

A. Enter a declaration that Defendants violated the FHA, NYSHRL, and NYCHRL by discriminating against Plaintiff based on her disability and denying her full and equal access to their facilities and amenities

B. Issue an injunction ordering Defendants to modify their policies, practices, and procedures to ensure that individuals with disabilities, including those who use service animals, receive equal access to Defendants' facilities and amenities as compared to

other individuals:

    a.  <u>Service Animal Policy:</u> Defendants must maintain, distribute, make available, and enforce a service animal policy that complies with the requirements of the FHA and implementing regulations in addition to the NYSHRL and NYCHRL.

    b.  <u>Distribution of Service Animal Policy:</u> Defendants shall distribute the Service Animal Policy to all its agents, employees, and contractors, and other employees or contractors whose duties involve contact with residents or the public at Defendants' facilities. Defendants shall ensure that all new employees, agents, or contractors whose duties involve customer service or contact with residents or the public in Defendants' facilities receive a copy of the Service Animal Policy on or before his or her first day of service or employment with Defendants.

    c.  <u>Proof of Distribution of Service Animal Policy:</u> Defendants will maintain proof of distribution of its Service Animal Policy, including the name, title, and date that each individual received the policy.

    d.  <u>Training:</u> Defendants shall train all present and future employees, agents, and contractors to ensure that all persons with disabilities, including those with service animals, are treated in a nondiscriminatory manner and are afforded the same service and courtesy as that afforded to other residents and members of the public, consistent with the Service Animal Policy.  The training shall include an overview of the NYCHRL, NYSHRL, and FHA.

    e.  <u>Signs:</u> Defendants shall post the following notice, printed in 26-point font or larger throughout the facilities and amenities where it can be readily seen by residents and the public: "Persons with disabilities who are accompanied by a service animal are welcome. No documentation is required." Notices will remain

posted indefinitely, will be readily visible, and will be replaced if damaged.

f.  <u>Incorporation of Service Animal Policy into All Employment Contracts:</u>
Defendants will require compliance with the Service Animal Policy as a term of
any new, amended, or renewed contracts with any person who is providing
services in association with Defendants in Defendants' facilities and/or any
person who leases and/or shares facilities with Defendants.

g.  <u>Complaint Records and Procedures:</u> Defendants will maintain records of the
complaints received, investigations, and remedial action taken regarding the
Service Animal Policy. Specifically, any future complaints made by the Board,
management, or any residents regarding Plaintiff's service dog or any other
complaints involving Plaintiff must be fully documented and include all three of
the following: (1) a written and signed witness statement from an employee or
authorized personnel present during the incident, detailing the facts as observed;
(2) a written and signed complaint from the resident who is making the
complaint, specifying the nature of the issue and the exact circumstances; and (3)
surveillance footage documenting the incident in its original, unaltered form.
This documentation must be provided to Plaintiff in full within 10 business days
following the filing of any complaint. Further, any complaints or accusations
made against Plaintiff shall be handled by a third-party mediator or arbitrator of
Plaintiff's choosing. This third-party entity will be selected at Plaintiff's
discretion and will be paid for by Defendants. The Resident shall not be required
to accept the judgment or decisions of Defendants in any matters relating to these
complaints.

h.  <u>Retaliation Prohibitions:</u> Defendants will not retaliate against Plaintiff for filing

a complaint or otherwise exercising rights protected by city, state, and federal law.

C.  Issue an injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies individuals accompanied by service animals meaningful access to, and full and equal enjoyment of, Defendants' facilities, services, or programs in violation of the FHA, NYSHRL, and NYCHRL;

D.  Order Defendants to take such affirmative steps as may be necessary to restore, as nearly as practicable, Plaintiff to the position he would have been in but for the discriminatory conduct.

E.  Award to Plaintiff:

    a.  Nominal damages;

    b.  Compensatory damages;

    c.  Punitive damages;

    d.  Reasonable costs and attorney's fees;

    e.  Interest on all amounts at the highest rates and earliest dates allowed by law; and

    f.  Any and all other relief that this Court deems just and proper.

Dated: April 29, 2025                    Respectfully submitted,

David John Hommel, Esq.
Andrew M. Clark, Esq.
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
Tel: (212) 353-8700
Fax: (917) 591-2875
dhommel@eandblaw.com
aclark@eandblaw.com
*Attorneys for Plaintiff*